**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **VIRGINIA LEADER,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:08cv00046 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By: Pamela Meade Sargent |
| Defendant. | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

The plaintiff, Virginia Leader, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

-1-

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Leader protectively filed her current applications for DIB and SSI on June 21, 2005, alleging disability as of June 21, 2005, due to headaches, back problems, a problem with her right leg, joint pain and depression. (Record, ("R."), at 67-69, 76, 87, 210-12.) The claims were denied initially and upon reconsideration. (R. at 29-32, 33, 35-37.) Leader then requested a hearing before an administrative law judge, ("ALJ"). (R. at 38.) The ALJ held a hearing on January 18, 2008, at which Leader testified and was represented by counsel. (R. at 213-47.)

By decision dated May 20, 2008, the ALJ denied Leader's claims. (R. at 11-22.) The ALJ found that Leader met the disability insured status requirements of the Act for DIB purposes through September 30, 2008. (R. at 13.) The ALJ also found that Leader had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 13.) The ALJ determined that the medical evidence established that Leader suffered from severe impairments, namely headaches, depression and fibromyalgia; however, he found that Leader did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-15.) The ALJ found that Leader was able to

perform simple, unskilled, medium work[1] that did not require interacting with the general public. (R. at 15-21.) The ALJ found that Leader was unable to perform any of her past relevant work. (R. at 21.) Based upon Leader's age, education, work experience and residual functional capacity, as well as the testimony of a vocational expert, the ALJ determined that there were jobs existing in significant numbers in the national economy that she could perform, including those of a laundry worker, an industrial cleaner and a poultry hanger. (R. at 21-22.) Therefore, the ALJ concluded that Leader was not under a disability as defined in the Act and was not entitled to DIB or SSI benefits. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

After the ALJ issued his decision, Leader pursued her administrative appeals, (R. at 7), but the Appeals Council denied her request for review. (R. at 4-6.) Leader then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2008). This case is before the court on Leader's motion for summary judgment, which was filed January 28, 2009, and on the Commissioner's motion for summary judgment, which was filed on February 27, 2009.

## II. Facts

Leader was born in 1967, (R. at 67), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Leader graduated from high school and

---

[1]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2008).

has past work as a sales clerk, a manager of a cattle ranch, a flagger for a road construction crew and as a certified nursing assistant. (R. at 77-78, 81, 220-23.)

At her July 18, 2008, hearing, Leader testified that she had suffered from a headache constantly since 2005. (R. at 224.) Leader said the pain was an eight or nine on a ten-point scale. (R. at 224.) Leader stated that the pain was so bad that she had to go to bed in an attempt to relieve it at least twice a week. (R. at 225.) Leader also claims that she has lost the peripheral vision in her right eye. (R. at 225.) Leader also testified that she suffered from constant neck and lower back pain. (R. at 226-28.)

The record contains medical evidence from Weleetka Family Clinic spanning several years, beginning in 2004. (R. at 172-83.) On November 15, 2004, Leader sought treatment for a sore throat and back pain. (R. at 172.) Jan Parker, P.A., diagnosed Leader as suffering from an upper respiratory infection. (R. at 172.) Oddly, without documenting any psychological complaints, Parker prescribed Prozac and Ambien for Leader. (R. at 172.) Leader's prescriptions were refilled on December 21, 2004. (R. at 172.) On August 29, 2005, Parker changed Leader's medication from Prozac to amitriptyline. (R. at 175.)

On January 10, 2005, Leader saw Parker requesting a trigger point injection on her back. (R. at 142.) Parker prescribed Cataflam. (R. at 142.) A refill of Cataflam was called in to a pharmacy for Leader on February 22, 2005. (R. at 142.) On March 1, 2005, Leader returned to see Parker, complaining of back pain. (R. at 141.) Parker noted that she changed Leader's medication from Cataflam, but the new medication name is not legible. (R. at 141.) Parker also noted that Leader should continue taking

Prozac. (R. at 141.) On April 20, 2005, a refill of Leader's Prozac prescription was call in to a pharmacy. (R. at 141.)

On June 21, 2005, Leader was seen at the emergency room of Holdenville General Hospital in Holdenville, Oklahoma, for complaints of a headache continuing for two months. (R. at 104-05.) Leader was given a Toradol injection, a prescription for Ultram and was referred to a neurologist. (R. at 104.) On June 28, 2005, Leader was seen at the emergency room of Valley View Regional Hospital in Ada, Oklahoma, complaining of continuing headache pain. (R. at 107-18.) Leader was given Compazine and Nubain intraveneously and discharged with instructions to take ibuprofen and Aleve. (R. at 109, 111.) CT scans of Leader's head and cervical spine were unremarkable. (R. at 114-15.)

On June 29, 2005, Marc Kagan, P.A., saw Leader for a complaint of a constant headache for the previous two months. (R. at 132-34.) Kagan reported that Leader appeared in discomfort. (R. at 132.) She also complained of depression, anxiety and insomnia. (R. at 132.) Kagan noted some posterior muscle tightness/tenderness in Leader's neck. (R. at 134.) Kagan stated that Leader suffered from chronic severe headaches, most likely caused by stress. (R. at 134.) He ordered an MRI and gave her injections of Nubain and Phenergan. (R. at 134.) A July 6, 2005, MRI of Leader's brain showed no acute abnormality. (R. at 129-30.)

Leader returned to see Kagan on July 25, 2005, complaining of continuing headache. (R. at 135.) Kagan stated that Leader suffered from chronic debilitating cephalgia, anxiety, depression, insomnia and fatigue. (R. at 135.) Kagan prescribed

Lortab, amitriptyline and Phenergan, and he increased Leader's Prozac. (R. at 135.)

On July 26, 2005, Kagan completed a Work Tolerance Report for the Oklahoma Department of Human Services.[2] (R. at 127.) On this form, Kagan stated that Leader suffered from "severe debilitating cephalgia poorly responsive to conservative care. Needs further testing that she can not [sic] afford to get without assistance. Needs neurological referral/care." (R. at 127.) Kagan also stated: "Until we are about to achieve better control[] of her debilitating cephalgia, she is for all practical purposes non-functional." (R. at 127.) Kagan stated that Leader's prognosis was bad without proper care or treatment, but good with proper evaluation and care by a neurologist or pain specialist. (R. at 127.)

On August 8, 2005, Leader returned to Parker complaining of back pain and headaches. (R. at 131.) Parker referred Leader to a neurologist and prescribed Paxil. (R. at 131.)

On August 29, 2005, Parker completed a Work Tolerance Report for the Oklahoma Department of Human Services. (R. at 125-26.) On this form, Parker indicated that Leader had no exertional limitations. (R. at 125-26.) Parker stated that Leader was severely depressed and "absolutely unable to be gainfully employed at this time." (R. at 126.)

On September 14, 2005, Dr. Everett E. Bayne, M.D., a psychiatrist, evaluated Leader at the state agency's request. (R. at 121-22.) Leader stated that she had begun

---

[2]The first page of this form is not contained in the record. (R. at 127.)

seeing a counselor for depression three weeks prior to the evaluation. (R. at 121.) Leader also stated that she had been taking Paxil for more than two years and had taken Prozac before that. (R. at 121.) Leader complained of a three-month history of severe headaches of unknown etiology. (R. at 121.) Leader stated that her sleeping was "not too good," her interest level was decreased, her energy level was poor and she fatigued easily. (R. at 121.) Leader described both her concentration and short-term memory as poor. (R. at 121.)

Dr. Bayne stated that Leader's mood and affect were dysphoric and somewhat restricted in range. (R. at 121.) He stated that Leader appeared oriented to person, place, date and situation. (R. at 121.) Dr. Bayne diagnosed Leader as suffering from major depression, recurrent. (R. at 122.) He also stated that, with treatment, Leader's condition would be expected to improve within 12 months. (R. at 122.) Dr. Bayne stated that Leader was "employable." (R. at 122.)

On October 18, 2005, S. Kay Taber, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on Leader's condition. (R. at 144-57.) Taber stated that Leader suffered from an affective disorder. (R. at 147.) Specifically, Taber stated that Leader suffered from a depressive syndrome characterized by sleep disturbance, decreased energy and difficulty concentrating or thinking. (R. at 147.) Taber stated that Leader's condition resulted in moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. (R. at 154.)

Taber also completed a Mental Residual Functional Capacity Assessment of Leader's condition on October 18, 2005. (R. at 158-61.) Taber found that Leader was moderately limited in her ability to understand, remember and carry out detailed instructions and markedly limited in her ability to interact appropriately with the general public. (R. at 158-59.) In all other areas, she found that Leader was not significantly limited. (R. at 158-59.) Taber stated that Leader could understand and perform simple and some complex tasks with supervision. (R. at 160.) She stated that Leader could "interact appropriately with others at a superficial level, but not the general public." (R. at 160.) Taber stated that Leader could "adapt to a work situation." (R. at 160.) On May 9, 2006, Carolyn Goodrich, Ph.D., a state agency psychologist, reviewed and affirmed Taber's assessment. (R. at 189.)

On November 7, 2005, Dr. Luther Woodcock, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on Leader. (R. at 163-70.) Based on his review of the medical evidence, Dr. Woodcock stated that Leader could occasionally lift and carry item weighing up to 50 pounds and frequently lift and carry items weighing up to 25 pounds. (R. at 164.) Dr. Woodcock stated that Leader could stand and walk and sit up to six hours in an eight-hour workday. (R. at 164.) He stated that Leader experienced no postural, manipulative, visual, communicative or environmental limitations. (R. at 165-67.) On July 17, 2006, Dr. Kenneth Wainner, M.D., a state agency physician, reviewed and affirmed Dr. Woodcock's assessment. (R. at 199.)

On January 11, 2006, Leader returned to Parker and requested a prescription for Percocet and completion of paperwork for disability. (R. at 181.) Parker discontinued

a prescription for Lyrica because Leader stated that it made her dizzy, and she gave her a prescription for Percocet. (R. at 181.) It should be noted that Parker's objective assessment of Leader on that day appears completely normal. (R. at 181.) Nonetheless, without documenting any complaints of muscle aches or pains or fatigue, Parker lists Leader's diagnoses as fibromyalgia and chronic fatigue syndrome. (R. at 181.) On January 17, 2006, Parker refilled Leader's prescription for Ambien. (R. at 181.) On February 28, 2006, Leader complained of headaches, generalized weakness and loss of part of her vision. (R. at 182.) Parker noted that Leader might be suffering from migraine headaches or a nerve problem. (R. at 182.) Parker noted that she refilled Leader's Endocet. (R. at 182.) On March 21, 2006, Leader complained of left knee pain. (R. at 183.) Parker ordered an ultrasound test of Leader's carotid arteries and an electroencephelograph, ("EEG"). (R. at 183.) The ultrasound results were normal, (R. at 185), but the record contains no reports from an EEG.

On February 20, 2008, Leader was seen by Dr. Bradley K. Farris, M.D., at the Dean McGee Eye Institute Neuro-Opthalmology Clinic. (R. at 201.) Dr. Farris found Leader's corrected visual acuity to be 20/20 in each eye. (R. at 201.) Dr. Farris stated that the rest of Leader's neuro-opthalmological evaluation was unremarkable, with the exception of tunnel visual fields with some prominence of loss of vision to the right in each eye. (R. at 201.) Dr. Farris stated that he believed that Leader's chronic headaches were related to a combination of greater occipital neuralgia on the right and migraine. (R. at 201.) He recommended that Leader see a neurologist for further evaluation and treatment. (R. at 201.)

Dr. Joseph Tran, M.D., saw Leader for a consultative examination on May 13,

2006. (R. at 191-97.) Dr. Tran stated that Leader was seeking disability based on fibromyalgia and chronic fatigue syndrome. (R. at 191.) Dr. Tran stated that Leader had been diagnosed with Epstein-Barr virus. (R. at 191.) Leader stated that she was tired all of the time and spent most of the day lying on the couch. (R. at 191.) Leader complained of joint and muscle pain in her shoulders, elbows, knees, hips and ankles. (R. at 191.) Leader also reported suffering from chronic daily headaches since June 2005. (R. at 191.) Leader also complained of severe weakness and limited range of motion in her joints. (R. at 192.) Dr. Tran stated that Leader was in tears due to pain during the examination. (R. at 192.) Dr. Tran found Leader's deep tendon reflexes, ranges of motion and gait to be normal. (R. at 193.)

## *III. Analysis*

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is

unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated May 20, 2008, the ALJ denied Leader's claims. (R. at 11-22.) The ALJ found that Leader met the disability insured status requirements of the Act for DIB purposes through September 30, 2008. (R. at 13.) The ALJ also found that Leader had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 13.) The ALJ determined that the medical evidence established that Leader suffered from severe impairments, namely headaches, depression and fibromyalgia; however, he found that Leader did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-15.) The ALJ found that Leader was able to perform simple, unskilled, medium work that did not require interacting with the general public. (R. at 15-21.) The ALJ found that Leader was unable to perform any of her past relevant work. (R. at 21.) Based upon Leader's age, education, work experience and residual functional capacity, as well as the testimony of a vocational expert, the ALJ determined that there were jobs existing in significant numbers in the national economy that she could perform, including those of a laundry worker, an

Case 2:08-cv-00046-JPJ-PMS   Document 17   Filed 06/02/09   Page 11 of 14   Pageid#: 69

industrial cleaner and a poultry hanger. (R. at 21-22.) Therefore, the ALJ concluded that Leader was not under a disability as defined in the Act and was not entitled to DIB or SSI benefits. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

Leader argues that the ALJ's decision that she was not disabled is not supported by substantial evidence. In particular, Leader argues that the ALJ erred in failing to give proper weight to the opinions of Leader's treating physicians. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-10.) Leader also argues that the ALJ erred by failing to consider the impact of her fibromyalgia and chronic fatigue on her ability to work. (R. at 10-14.)

The medical evidence contained in this record shows that the health care professional who most often treated Leader, Parker, did not place any physical restrictions on Leader's work-related activities. In fact, there is no evidence contained in this record to show that Leader suffered from physical impairments that prevented her from performing work at the medium exertional level. Instead, Parker opined that Leader was disabled as a result of her mental impairments due to depression. Despite this opinion, however, there is no evidence contained in this record to show that Parker thought Leader's mental impairment was severe enough to refer her for psychological or psychiatric evaluation and treatment. Also, both Dr. Bayne's psychiatric evaluation and the state agency psychologists assessments support the ALJ's finding that Leader's depression did not prevent Leader from performing simple, unskilled, medium work that did not require interacting with the general public. That being the case, I find that substantial evidence supports the ALJ's decision with regard to Leader's residual functional capacity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the Commissioner's finding as to Leader's residual functional capacity; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Leader was not disabled.

## RECOMMENDED DISPOSITION

The undersigned recommends that this court deny Leader's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636 (b)(1)(C):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or

modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in the matter to the Honorable James P. Jones, Chief United States District Judge.

The clerk is directed to send copies of this Report and Recommendation to all counsel of record.

**DATED:** This 2nd day of June 2009.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE